Filed 12/8/21  In re P.J. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re P. J. et al., Persons Coming Under the Juvenile Court Law. | B308731, B309970<br><br>(Los Angeles County Super. Ct. Nos. 20CCJP03795, 20CCJP03795 A-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>P. J. et al.,<br><br>    Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Michael D. Abzug, Judge.  Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant P.J.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant J.J.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Stephen D. Watson Deputy County Counsel, for Plaintiff and Respondent.

Mother J.J. appeals jurisdictional and dispositional orders concerning her four children, D., T., P., and M. Father P.J., the presumed father of P. and M., challenges the orders as they pertain to those children. We conclude the jurisdictional order is supported by substantial evidence, the juvenile court sufficiently stated facts in support of removing the children from mother at disposition, and the juvenile court did not abuse its discretion by requiring monitored visitation. We accordingly affirm.

## BACKGROUND

*The Family*

In June 2020, P. (then 6) and M. (then 3) lived with mother in Los Angeles. D. (then 15) was with his father, D.H., in Las Vegas, and T. (then 13) was with her father, C.B., in southern California. The whereabouts of P. and M.'s father (father) were unknown.

*First 911 Call and Investigation*

The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) on June 7, 2020, when the agency received an allegation of general neglect. Per the report, mother called 911 and reported P. had been shot in the head. Responding paramedics and law enforcement officers quickly discovered that P. had not been shot; he and M.

2

were both unharmed.  Mother apologized and informed the responders that another of her sons had been shot in the head and killed a few years ago.[1]  One of the law enforcement officers stated that mother "was rambling" and "redirected the conversation when they tried to get more information."  Mother's statements "did not make any sense" and she appeared to have urinated on herself.  The home was "filthy with clutter and trash everywhere."  The officers thought "something was off" with mother, but did not see a need for a Welfare and Institutions Code section 5150[2] hold.

A DCFS children's social worker (CSW) went to the family home on June 10, 2020 to investigate.  Mother answered the door and became hostile toward the CSW, calling him names, using profanity, and threatening to sue him and DCFS.[3]  The CSW successfully met with mother two weeks later, on June 23, 2020.

---

[1] Multiple parties later confirmed that D. was shot twice, in the chest and hip, during a drive-by shooting when he was eight years old.  His wounds were not fatal.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[3] Mother also mentioned that she remembered the CSW "from last time"; the family had five prior referrals, the most recent of which occurred in November 2019 and alleged the children were "malnourished and skinny," the home "has not had electricity in a month," and mother "is not in a stable mental state [and] is using drugs."  That referral was closed as inconclusive after it was determined that mother was purchasing take-out food for the children and the utilities were on.  The only substantiated referral alleged that mother and C.B. engaged in an episode of domestic violence in 2010, during which mother "threw a potted plant" at C.B. and cut his arms and hands by stabbing him with a broken piece of the pot.

At that time, mother denied all forms of abuse and neglect. She explained that on the day of the incident, P. was eating and choked. Mother helped him, then saw a flash from outside. Mother noticed that P.'s head was down, so she immediately thought someone had shot him and called 911. Mother said she was not intoxicated at the time and believed she had a flashback to 2014, when D. was non-fatally shot. She stated she was "frantic that night" and "tried to pull herself together when authorities were at the home." Mother reported that she had completed some therapy in 2015, after D.'s shooting, and said she would like to be linked to more therapy services.

The CSW also spoke to P. and M. on June 23, 2020. P. was difficult to understand due to a speech impediment, and M. was "too young and was hard to understand," but the CSW was able to obtain some information from both children. Both said that the police came to the house to check on P. after he choked. They denied any shooting or injury. They also denied abuse, and visual inspections pursuant to DCFS's "disrobing policy" did not reveal any marks indicating abuse. The CSW noted that both children were dressed appropriately and "appeared happy and healthy."

The CSW spoke to mother over the phone on June 25, 2020. Mother "became agitated" and used profanity toward the CSW. Mother calmed down after the CSW explained that he was calling only to ask when D. and T. were scheduled to return to the home so he could interview them.

The CSW met with T. and her father, C.B., on July 6, 2020. T. stated that she was not present on the day of the incident; she had been living with C.B. since the onset of the pandemic. One portion of the detention report states that T. denied abuse or

neglect by mother, and another portion states that T. said mother sometimes hit her and "even threw a knife towards me." T. shared with the CSW text messages and voicemails in which mother cussed her out for wanting to live with C.B., and told the CSW she preferred living with C.B. because she gets along better with him. T. also said that mother "is random with her mood" and "sometimes talks to herself like she is having a conversation with family." T. denied any previous incidents of mother "acting strange or assuming her or her siblings were shot." T. usually ate breakfast and lunch at school, and said mother brought home prepared food for dinner.

C.B. denied abuse or neglect by mother but stated that he would prefer T. stay with him because "he gives child a better home environment." C.B. denied knowledge of mother using substances or struggling with mental health issues, though he thought "mother might have some bipolar issues due to her mood swings and always hostile [*sic*] with him during communication." C.B. said that T. told him that mother "stays up late and stares at the wall sometimes" and "does not cook" for the children, but he never called DCFS because "sometimes [T.] can lie or exaggerate her interactions with mother."

The CSW met with D. and his father, D.H., on July 7, 2020. D. confirmed he had been shot when he was eight, and that he was not present during the recent incident with P. D. denied mother having prior flashbacks or mental health issues; he said she was "just sometimes weird." Like T., he mentioned that mother often talked to herself; D. added that mother says "she is talking to google on her phone and jokes about it." D. reported that mother and T. had a contentious relationship; mother yelled profanities and made hurtful comments to T., and T. talked back,

5

disobeyed mother's directions and curfew, and made inappropriate posts on social media. D. said mother usually only yelled at T., but had spanked her a few times. D. denied any knowledge of mother throwing a knife at T., and he did not believe she or his other siblings were in danger with mother. D. told the CSW that he preferred living with D.H.

D.H. told the CSW he had no knowledge of any abuse or neglect in mother's home. He denied that mother had any mental health issues; he attributed her mood swings to her financial struggles and disputes about co-parenting. D.H. reported that mother had used marijuana in the past but denied she had any substance abuse issues. He further reported that D. had never complained of any issues getting enough to eat; in short, he had no concerns about D. or his siblings when they were in mother's care.

The CSW spoke with maternal grandmother (MGM) on July 6, 2020. MGM stated that although she and mother did not have "the best of a relationship," she "visits every now and then." MGM expressed concern with mother's ability to care for all four children due to her "financial challenges"; she opined that mother "needs to let the older children . . . go with their fathers," because "it is easier to manage less children for mother." MGM denied that mother had any history of mental health issues, but suggested mother "could have some bipolar issues" as evidenced by mother's mood swings and aggression with people. MGM denied any knowledge of abuse of the children or any issues with mother feeding them.

*Second 911 Call and Continued Investigation*

On July 9, 2020, mother called 911 and yelled "1585 1585 to send help" before hanging up.[4] The call was traced to mother's home, and both police and firefighters responded. A police officer told the CSW that mother called 911 because P. choked and vomited. He stated that it was difficult to get this information out of mother, who did not focus on the responders' questions and "would switch topics in mid conversation to the [musical] artist Chris Brown and how gangs in [her neighborhood] are." Mother also "became hostile[,] yelling at them and threatening to sue them." The officer did not suspect substance abuse; he thought "mother has to have mental health issues." Responders witnessed P. vomit two more times, and told mother he needed to be seen by a doctor. Mother said she would take him, but they did not trust her so they escorted mother, P., and M. to the hospital.

The CSW spoke with mother at the hospital. He noted that she was dressed appropriately and did not appear to be under the influence of any substances, though he "did smell a slight body odor." Mother told the CSW that P. began choking and threw up as she was waking him from his nap; she believed he choked on his saliva because she had startled him. Mother said she then called 911. Mother denied neglecting or abusing the children in any way. She admitted to "getting upset" and saying demeaning words and profanity to T., but stated that she apologized afterward if "it is too offensive." Mother also admitted to spanking T. on the buttocks with her hand and "explod[ing] on" T. due to how T. and T.'s father treated mother, though she denied any sort of knife incident. Mother said T. and D. could

---

[4] 1585 is a portion of mother's address.

7

live with their fathers if they wanted to.  The CSW reported that mother "was coherent enough to fully answer" questions "without any rambling or changing the conversation in mid sentence," and she signed a safety plan pursuant to which MGM would stay in mother's home during the day but go home to sleep at night. MGM declined to care for P. and M. in her home "due to her living situation."

The CSW also spoke with P. and M. at the hospital. Both P. and M. appeared happy and healthy and were dressed appropriately for the weather.  P. told the CSW that the police came because he choked and threw up when mother woke him up.  M. also  told the CSW that the police came to the home because P. was choking.  The CSW did not observe any marks or bruises on either child, though he noted that P.'s shirt had "food stains" and M.'s was "dirty."

The CSW also spoke to Dr. Katheria, the physician who treated P., and hospital social worker Karolin Ferrier.  Dr. Katheria did not see any injuries on P. and said "[t]here was no indication of what caused the incident and the child is able to be discharged."  Dr. Katheria reported concerns about mother's mental state; mother did not fully answer questions and changed topics mid-sentence, but was not hostile.  Dr. Katheria said the hospital was unable to perform a mental health assessment because mother did not come to the hospital for that reason and had not otherwise consented.  Ferrier told the CSW that mother appeared to have some type of mental health issue.  Mother was unable to provide fully coherent answers to questions, "she would switch topics about dating Chris Brown and gang violence," and she vacillated between being nice and acting irritated.  Ferrier expressed concern about mother's mental state and her ability to

8

properly care for the children; she noted that both P. and M. had been wearing dirty clothes and "all of them smelled like body odor like they did not take[ ] a bath and it was strong soon as you walk in the room."

After the CSW left the hospital, he received an email from Ferrier stating that mother refused to comply with the safety plan and leave the hospital with MGM. The email further stated that a doctor said mother "began shouting she was a 'God' and she did not agree to leave with her mother." Both a doctor and nurse reported that mother "came back and forth out of Pediatrics, stating she was not going"; the nurse further stated that mother cursed at her and told her to shut up.

The CSW spoke with MGM the following day. MGM confirmed that mother became upset when MGM arrived at the hospital to take her home, and mother refused to leave with MGM. When MGM stopped by the home later that evening, mother and the children were there. MGM stated that mother did not want her to stay at the home despite the safety plan, but MGM planned to stop by multiple times a day to check on P. and M.

*Detention, Section 300 Petition, and Initial Hearing*

DCFS obtained a removal order and detained all four children from mother on July 14, 2020. Two days later, it filed a juvenile dependency petition under section 300, subdivision (b)(1), alleging that mother "has mental and emotional problems, including aggression, delusions, paranoia, mood swings, bizarre and erratic behaviors, which renders the mother incapable of providing regular care for the children. Such mental and emotional problems on the part of the mother, endangers the

9

children's physical health and safety and places the children at risk of serious physical harm, damage, and danger."[5]

In advance of the initial hearing, DCFS filed a last minute information stating that MGM had called to express concerns that mother may be abusing some sort of illicit substance. DCFS asked MGM why she failed to raise these concerns earlier, and she replied that mother "is talking to herself and keeps oddly walking around outside." MGM also stated that she "was informed" that T. had "downplayed" her statements to the CSW in hopes of preventing her younger siblings from being placed in foster care.

The court held the initial hearing via WebEx on July 21 and July 22, 2020.[6] The court found D.H. was the presumed father of D., C.B. was the presumed father of T., and father was the alleged father of M; it deferred making findings regarding father's paternal relationship to P. The court found DCFS made a prima facie case for jurisdiction, but the children could be released to mother's care if mother agreed to safety conditions the court emphasized were "not voluntary or optional."[7] The safety conditions required mother to (1) immediately enroll in individual counseling, to which DCFS was to provide referrals; (2) "immediately take steps to have a psychiatric assessment" and

_____

[5] The petition also included a second count alleging that P. and M. were at risk due to father's "criminal history and conduct." This allegation was ultimately dismissed and is not at issue here.

[6] The court made emergency detention findings as to D. at the July 21 hearing, but continued D.'s proceedings to July 22 so counsel could be appointed for him.

[7] D. and T. were also released to their respective fathers' care.

10

comply with any recommended treatment; (3) submit to weekly random or on-demand drug testing and test negative, or at least with decreasing levels of marijuana; (4) make herself and the children available for unannounced home visits by DCFS; and (5) participate in the family preservation services to which DCFS was ordered to refer her. The court directed DCFS to "bring it to the court's attention" if the conditions were violated. It also told mother directly that she was ordered to comply with the safety conditions, and advised her, "[i]f you do not, the Department will bring it to my attention. . . . I may go ahead and detain the children based on any further evidence of violating the safety conditions. Do you understand?" Mother stated, "Yes. I have no problem with everything you said." The court ordered DCFS to provide mother with "case appropriate referrals" and scheduled the jurisdiction hearing for August 20, 2020.

*Jurisdiction/Disposition Report*

DCFS filed a jurisdiction/disposition report on August 18, 2020. In preparing the report, it spoke with members of the family about the allegations and their current situations. On August 13, DCFS spoke with D., who was still living with D.H., by phone. D. stated that when he lived with mother, she did a lot of "crazy stuff," like talking to herself and claiming she was talking to musicians Chris Brown and Little Wayne on her Google phone. D. clarified that mother never physically hurt the children or herself, but "said some hurtful things" to T. When asked about the conditions at mother's home, D. stated that at one point, the electricity had been turned off for two to three months; he and T. went to the park to do their homework. D. further stated that there was food in the house, "but if there

11

wasn't I would call [MGM] and she would bring us some food. I had to call her every week or two weeks or so for that."

DCFS visited P. and M. at mother's home on July 31, 2020. Neither child was able to provide "meaningful" statements; DCFS again noted P.'s "severe speech impediment" and stated that M. "has a very limited vocabulary." DCFS reported that P. was "clean, well-groomed and without marks and bruising." No assessment of M. was reported, other than a statement that DCFS had no immediate safety concerns for the children. The home was "sparsely furnished" and "cluttered and there were clothing and items thrown on the floor everywhere."

DCFS did not speak with T., who had returned to living with mother; it stated that "she is unable to talk at home with her mother and that she works when she is not home." DCFS represented that it would "continue to engage" T. and "provide an update to the court." DCFS also did not discuss the allegations with mother during the July 31 home visit; the only comment in the report is that mother said she was "working on undergoing a mental health assessment." DCFS called mother on July 28, August 4, August 6, August 12, and August 13, but received no response. Mother also was a no-show for her drug test on July 22, 2020, though she told DCFS she had taken the test.

D.H., D.'s father, spoke with DCFS over the phone. He said mother seemed fine when he talked with her on the phone approximately twice a week, but both D. and MGM had told him mother was "acting differently, like mentally," over the past few years.

MGM also spoke with DCFS over the phone. She stated that mother rarely answered the phone when anyone called, including MGM, the children's schools, and DCFS. MGM further

12

reported that the schools sometimes called her instead, because she was listed as an emergency contact.  MGM stated that she was concerned for the children's well-being.  She had not spoken to mother since July 21, 2020, "the day she got the kids back."  She nevertheless reported that mother "talks to me crazy," such that "her subject content just doesn't make sense," and "walk[s] up and down the driveway for hours talking to herself."  MGM further stated that mother was "paranoid" and "has lashed out verbally in anger at people."  MGM added that T. had been "pick[ing] up the slack" for mother, by "carrying out a parent's responsibility like caring for the younger kids [and] going grocery [shopping]."  MGM stated that she had encouraged mother to send D. and T. to live with their fathers during the pandemic, because "they would have nothing to eat" on weekends; mother bought fast food for P. and M., "but the older kids would get nothing."  MGM said, "I go over there on a weekly basis to make sure that she was feeding them properly," because "[w]hen she goes into her bizarre state, making sure her kids eat three meals a day is not a priority for her.  Even her eating is not a priority and she has lost a lot of weight."  MGM similarly reported that cleaning was not a priority: "the home was a disaster," with "food, and junk all over," and minimal furniture.  Like D., she stated that the home's electricity had been turned off for an extended period, as had the gas.

DCFS followed up with police officers who had responded to mother's two 911 calls.  Los Angeles Police Department officer Rodney Ucles, who responded to the first 911 call, stated that mother was "calm and collective [*sic*] one minute, and explain the story to us, then she would snap back to being very emotional, apologetic and hysterically crying."  Ucles "wouldn't say it was a

13

mental health episode, but she said she had lost a child and I don't know what it is like to lose a child so empathized with her emotional state." Ucles stated that the children were asleep when mother called, and were shocked to see first responders, so he assumed mother "had some type of nightmare" that caused her to believe an incident occurred. He said that he had been concerned about the "overall environment" of the home, which was "unkempt and unclean," with "clothes and trash everywhere, old food on the stove." The "biggest eyebrow raiser," however, was that mother "looked like she peed herself." The children seemed fine.

Los Angeles Police Department officer Burgos responded to the second 911 call. He said mother "was having a mental psychotic episode," "rambling, saying she was Chris Brown's girlfriend, and engaging in incoherent conversation." Burgos further stated that he and other emergency responders "ended up taking the kid to the hospital because we didn't feel that the mom was in the right mental state to take him."

In its assessment of the family, DCFS reported that "mother's engagement with the Department has been inconsistent." When mother interacted with DCFS, she exhibited "severe mood swings" and "exhibit[ed] verbally aggressive behaviors." DCFS noted that mother had not been observed to be under the influence of any substances, but due to mother's failure to test it had been unable to determine if substance abuse was a "contributing factor in the mother's delusional, erratic, and concerning behaviors." DCFS reported that mother had not yet undergone a mental health assessment, and her "unaddressed mental and emotional issues" were "concerning and create a detrimental home environment," particularly given P.'s inability

14

to communicate clearly and M.'s "tender age." It also noted MGM's concerns that mother had "parentified" T. by having her work and care for her younger siblings. On the positive side, DCFS observed that mother had "demonstrated resiliency" after D. was shot, "utilizes her family support in times of need or crisis, despite any unresolved differences," and "is very resourceful and utilized concrete supports such as the Housing Authority Section 8 program . . . to meet the basic needs of the family and maintain stable housing."[8]

*August 20, 2020 Last Minute Information and Hearing*

On August 20, 2020, the scheduled date of the jurisdictional hearing, DCFS filed a last minute information notifying the court that father, whose whereabouts had been unknown, contacted DCFS the day before. Father stated that he

_____

[8] The day after DCFS filed the jurisdiction/disposition report, mother filed a notice of objections to hearsay statements pursuant to section 355, which provides in relevant part that objected-to hearsay evidence "shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based," unless DCFS makes the declarant "available for cross-examination." (§ 355, subds. (c)(1), (c)(1)(D).) Mother specifically objected to "any and all" statements made by MGM. During the jurisdiction hearing, however, mother's counsel did not mention the objections and instead asked the court to find MGM not credible. Counsel for DCFS also stated, with no objection from mother's counsel, "I do believe mother's counsel intended to withdraw her 355 objections to the maternal grandmother, who was available via subpoena. I do believe her statements will come in." The record does not contain a ruling on the section 355 objections, though it does indicate that MGM was present on August 20, 2020, the date for which the jurisdiction hearing was originally scheduled. Mother includes MGM's statements in the statement of facts in her opening brief.

15

could not remember the last time he had spoken to mother. He further stated, "I know she's crazy, kind [of] mental, but that's in a relationship. She takes care of the kids real good. She don't clean up a lot, but she handle[s] kids well."

Father and his newly appointed counsel made an initial appearance remotely at the August 20, 2020 hearing. His counsel requested a continuance of the jurisdiction hearing, as did counsel for D. and T. The court found good cause and continued the jurisdiction hearing to September 8, 2020.

Before the proceedings concluded, however, DCFS requested that the court deem the jurisdiction/disposition report as a section 385 petition seeking detention of the children from mother pending adjudication. The children's counsel asked the court to detain all four children from mother, but to release D. and T. to their fathers. Counsel acknowledged that she previously had argued in favor of releasing the children to mother, but stated she had changed her position in light of mother's failure to comply with the "very specific safety conditions" the court had ordered. Counsel expressed concern that mother had stopped communicating with DCFS, had not received a mental health assessment or enrolled in counseling, had not ensured P. was set up to participate in virtual schooling, and was allowing T., a very young teen, to work "all summer to help support the family."

Mother's counsel opposed detention, arguing that mother "has been compliant with the services worker going to her home" and that DCFS had not noted any safety concern with the home. Counsel indicated that mother's lack of response to DCFS's phone calls was due to "issues with her phone," and asserted that DCFS should have exercised its right to conduct more unannounced

16

visits.  Counsel asserted that mother had made an appointment for a psychiatric assessment, and that there was "no evidence" that DCFS had provided other relevant referrals for mother.

The court ultimately granted the section 385 petition and ordered the children detained from mother.  It found that "there can't be a safety plan put in place" to prevent detention, because "[w]e attempted to do that, but . . . the situation has not improved." D. and T. remained released to their fathers.  The court ordered monitored visitation for mother.  It also ordered DNA tests for P. and M. at father's counsel's request, and specifically directed DCFS to "make sure the mother has referrals that she needs in order to address the issues that caused the court to detain the children today."  It further ordered DFCS to "provide updated information . . . in regard to the mother's participation in services, and any change in recommendation."
*September 3 and 9, 2020 Last Minute Informations*

DCFS filed a last minute information on September 3, 2020.  It reported that it had assessed D.H.'s home and found it appropriate for D.  It further reported that, "after several requests, the mother has not provided the Department with documentation to support her statements that she has completed a mental health evaluation."  Additionally, mother had not signed a consent form to enable DCFS to access her mental health records, verified her enrollment in any programs, or drug tested. DCFS stated that it continued "to have grave concerns" about mother's unaddressed mental health needs and failure to comply with court orders.

On September 9, DCFS filed a second last minute information.  It stated that it had texted mother on August 25 to notify her that she had been "set up for drug testing" and provide

17

her with details how to participate. Mother "called the CSW after the message was sent and stated that 'I do not have to test. That is not what the Court ordered. I went down to the court and got the paperwork and I don't see where I have to test. I already tested once already. I got the paperwork. I'm not on drugs.'" The CSW texted mother on September 2 to see if she had started participating in any services. The text included the names of several service providers mother could contact. Mother called the CSW and stated that none of the service providers to whom she had been referred would accept her Medi-Cal insurance. The CSW informed mother that the providers did accept Medi-Cal, but mother "still went on to say that they don't." DCFS stated, "Mother is not being proactive and [is] continuing to deny that she has to drug test and has not provided CSW Miller with any documentation for mental health services." It recommended that all prior orders remain in effect.

*Jurisdiction Hearing*

The court held the jurisdiction hearing on September 9, 2020. It admitted into evidence all of the DCFS reports and last minute informations without objection. The matter then proceeded to argument. Counsel for the children asked the court to sustain the section 300, subdivision (b)(1) count against mother, because the evidence showed that "mother's mental health has impacted her ability to provide appropriate care to the children. The older children were not being fed, and the home environment was very concerning." Counsel for DCFS joined this argument, and further asserted there was a nexus between mother's declining mental health and the conditions of the home, the utilities being turned off, and MGM needing to ensure the children had food. Mother's counsel argued that there was no

18

substantial evidence that mother placed the children at risk. She emphasized that mother's anger had been directed at DCFS, not the children, and asserted there was "no noted diagnosis" of a mental health problem. Mother's counsel also urged the court to find MGM's statements not credible, because "[t]here's no indication she spends regular time with this family." All three fathers submitted without making substantive argument.

The court found there was substantial evidence "to find that the mother has failed to care for and supervise the children appropriately." It added that "mother appears to have a long and ongoing mental health history . . . and continues not to be able to care for and provide for her children in a reasonable manner. It appears they are being neglected . . . due to her inability or her unwillingness to seek out appropriate mental health care treatment." It accordingly found that the section 300, subdivision (b)(1) count concerning mother's mental health had been proven by a preponderance of the evidence.

The court ordered DCFS to prepare a last minute information in advance of the disposition hearing scheduled for October 1, 2020. It further ordered DCFS to provide mother with a written visitation schedule and a specific drug testing location.

*October 1 and 26, 2020 Last Minute Informations*

In a last minute information filed on October 1, 2020, DCFS reported that mother failed to appear for drug tests on September 2, 11, and 15. It further reported that mother had provided a "Client Discharge Plan" from Exodus Recovery dated September 18, 2020. According to that plan, mother "was assessed and diagnosed with Unspecified Adjustment Disorder"; no medications were prescribed, but mother was directed to follow up with mental health services with a different provider

19

(to whom DCFS had referred mother previously). DCFS reiterated that it continued to have "great concerns" about mother caring for P. and M. It recommended mother receive family reunification services. It recommended the same services for father, even though he had yet to submit to the DNA test he requested.

The court continued the disposition hearing to November 2, 2020. DCFS accordingly filed an additional last minute information on October 26, 2020. DCFS reported that it had not been able to reach mother because her phone number had been disconnected. To the CSW's knowledge, mother was not participating in any services; mother failed to appear for drug tests on September 25, October 2, and October 7. Despite mother's disconnected phone, DCFS heard from D., T., and P. and M.'s caregiver that mother was in regular phone contact with the children. Mother "did not want in-person visits" with P. and M. because she believed it would "be too difficult for her." Both children were doing well in their foster care placement.

*Disposition Hearing*

The court held the disposition hearing on November 2, 2020. It admitted all of the DCFS reports and last minute informations without objection. It found that father was the presumed father of P. and M., despite the still-pending DNA tests.

The children's counsel asked the court to adopt DCFS's recommendations and grant D.H. and C.B. full legal custody of D. and T., respectively, with unmonitored telephone visitation for mother. She further requested that P. and M. remain in suitable placement, where they were doing well; she asserted it would be detrimental to place them with father, who continued to contest

20

paternity, or mother, "based on the sustained allegation and her continued failure to comply with any services or testing at this time." Counsel for DCFS joined this argument and asked the court to remove the children from mother and father under section 361, subdivisions (c) and (d). She further requested the court order an Evidence Code section 730 mental health evaluation for mother.

Father's counsel argued that P. and M. should be placed with father. Barring that, counsel requested unmonitored visitation for father and objected to the proposed case plan to the extent it recommended a mental health assessment for him as well. Counsel for D.H. and C.B. largely submitted on DCFS's recommendation.

Mother's counsel argued that mother did not pose a risk to the children. "Although mother has some odd and bizarre behaviors, even when she has gotten frustrated, that frustration has never been directed at her children, and the evidence indicates . . . that she was taking good care of her children." Counsel asserted that "most of the statements to the contrary come from maternal grandmother," and again asked the court to disregard those statements. Counsel acknowledged the arguments that mother had failed to comply with the safety conditions, but stated that "we are predisposition, and mother's clear distrust of the system and the social worker does not in and of itself make her a risk to her children." Mother's counsel opposed removal and asked the court to return the children to mother.

The court found that D. and T. were safely in the custody of their fathers, and that it was "in the interest of justice and in the best interest and welfare of the children that jurisdiction be

terminated." The court accordingly terminated jurisdiction over D. and T., subject to family law orders giving D.H. and C.B. full physical and legal custody over them. Those orders were entered on November 6, 2020.

With respect to P. and M., the court acknowledged mother's counsel's argument that it could not order mother to participate in services "preadjudication." "Nevertheless," the court continued, "a parent's [un]willingness to abide by . . . safety plans and other programs that are designed to protect the welfare of the children and also to maximize the probability of reunification are troubling. And the absence of it, I think, supports [DCFS's] position that removal is appropriate on that ground, especially when, as set forth in the jurisdictional findings, which I now adopt, the mother was exhibiting behavior which is . . . detrimental and inconsistent to the safety and welfare of her children. So based on the totality of the record, I believe that removal at this juncture is appropriate. But she's going to be given reunification services. So today is today and tomorrow is tomorrow. And hopefully she will get herself squared away and get back with her children in the very near future. That's my hope." The court added that "Dependency Order 415 is attached," before stating that P. and M. were removed from both mother and father. The court ordered an Evidence Code section 730 evaluation for mother. It also ordered her to enroll in individual counseling, and the children to receive age-appropriate mental health counseling. The court ordered monitored visitation for both mother and father, "with discretion to liberalize."

Mother timely appealed from the jurisdiction and disposition orders concerning all four children. Father timely appealed only from the disposition orders concerning P. and M.

**DISCUSSION**

I.    *Substantial evidence supported the jurisdiction order.*

Mother contends, and father joins as to P. and M.,[9] that substantial evidence does not support the order taking jurisdiction over the children.  We disagree.

A.    *Legal Framework*

Section 300, subdivision (b)(1) authorizes a juvenile court to take jurisdiction over a child where the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child,  . . . or by the willful or negligent failure of the child's parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1).) A juvenile court's findings that a child is described by section 300, subdivision (b)(1) must be supported by a preponderance of the evidence. (§ 355, subd. (a); *In re I.J.* (2013) 56 Cal.4th 766, 773.) Thus, DCFS must prove "(1) one or more of the statutorily-specified omissions in providing care for the child . . .; (2) causation; and (3) 'serious physical harm

---

[9] Father's notice of appeal listed only the disposition orders. He nevertheless joins mother's arguments against the jurisdiction orders concerning P. and M.  As DCFS acknowledges in its response brief, notices of appeal are to be liberally construed where the respondent could not possibly have been misled or prejudiced.  (*In re Joshua S.* (2007) 41 Cal.4th 261, 272.)  DCFS concedes, and we agree, that it is not prejudiced by father's joinder of mother's jurisdictional arguments.

or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561.)

The juvenile court may not presume a child suffers harm due to a parent's mental illness. (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226.) That said, "[i]t is not necessary for DCFS or the juvenile court to precisely predict *what* harm" a child may suffer due to his or her parent's mental illness. (*Id.* at p. 1227.) "Rather, it is sufficient that Mother's illness and choices create a substantial risk of *some* serious physical harm or illness." (*Ibid.*) The juvenile court should consider the totality of the circumstances when determining whether a child is at risk of harm. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1440.) It need not wait until a child has suffered serious abuse or injury to assume jurisdiction and take steps to protect the child. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determination, and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] "'[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a

24

reasonable trier of fact could find [that the order is appropriate].'" [Citation.]" [Citation.]'" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

B.    *Analysis*

The juvenile court exercised jurisdiction under section 300, subdivision (b)(1) after finding that "mother has failed to care for and supervise the children appropriately." Specifically, the court found that mother did not seek appropriate treatment for her mental health issues and appeared to neglect and inadequately care for the children. These findings were supported by substantial evidence in the record.

In response to either a flashback or a nightmare, mother called 911 to report P. had been shot in the head when he had not been. Responders to the call observed that "something was off" about mother, and she was unable to answer their questions or provide accurate information about the shooting incident involving D. They also observed that the house was "filthy with clutter and trash everywhere." Approximately one month later, mother called 911 a second time to report a minor incident in which P. vomited. Responders again noted that mother seemed to be experiencing a "mental psychotic episode," telling them that she was Chris Brown's girlfriend and otherwise "engaging in incoherent conversation." The responders took P. (and mother, and M.) to the hospital to be seen by a doctor, because they did not believe mother "was in the right mental state" to ensure P. received proper follow-up care. Multiple people who interacted with the family at the hospital noted they were wearing dirty clothes and had body odor. A reasonable factfinder could conclude from this evidence that mother's mental problems were interfering with her ability to provide appropriate care to P. and

25

M., who were only six and three at the time and were unable to effectively communicate their needs.

Additional evidence supports this conclusion as to D. and T. as well. Multiple people told DCFS that mother had mood swings and acted aggressively; father said she was "crazy, kind [of] mental," and MGM said she spent hours walking up and down the driveway rather than supervising or interacting with the children. Mother herself told DCFS that she had "exploded" on T., and T. showed the CSW angry and profane text messages and voicemails mother had sent her. Both D. and MGM told DCFS that the family had been without electricity for months at a time, and D. and MGM had to take initiative in ensuring that the children, particularly the older ones, had sufficient food to eat. D., T., and various other individuals with whom mother interacted said mother interjected nonsensical claims into conversations and was not able to answer questions or provide relevant information about the children when necessary. Although the children "appeared happy and healthy," the lack of utilities, food, supervision, and appropriate responses to acts such as vomiting or backtalking placed them at risk of harm.

These problems remained largely unresolved at the time of the jurisdiction hearing despite the provision of services and referrals. Mother refused to comply with the safety plan mere hours after its creation and subsequently violated the safety conditions the court imposed to ensure the children could remain in her care. Mother refused to drug test and falsely claimed the services to which DCFS referred her did not accept her insurance. Mother eventually saw a mental health provider and was diagnosed with "unspecified adjustment disorder," but there is no indication she followed through with the treatment plan. Mother

also failed to maintain contact with DCFS, ignoring numerous calls and disconnecting her phone.

Mother contends the court improperly "focused on Mother's mental condition and the question of future risk rather than the threshold issue of whether mother had failed to supervise, protect, or provide regular care to the children." This argument, which appears to be drawn from *In re Joaquin C.*, *supra*, 15 Cal.App.5th at p. 561, is not persuasive. The court expressly found that "mother has failed to care for and supervise the children appropriately"; its focus was on mother's past and current ability to care for the children, not a future risk. Moreover, even if the court had focused on the future, that could still support the exercise of jurisdiction. Section 300, subdivision (b)(1) is implicated whether "[t]he child has suffered" *or* "there is a substantial risk that the child will suffer, serious physical harm."

Mother further asserts that the juvenile court lacked the authority to order her to complete a mental health assessment, drug test, or otherwise cooperate with DCFS prior to adjudication. The intended implication of this assertion is unclear, though it appears mother may be suggesting that her lack of compliance with orders could not support the exercise of jurisdiction. This is incorrect.

"[B]efore jurisdiction, the court can issue orders detaining the child and orders directing the social services agency to provide services, but it cannot order or otherwise compel the parent to cooperate with the agency. A parent's participation in services, whether before jurisdiction and disposition or after, is always voluntary." (*In re E.E.* (2020) 49 Cal.App.5th 195, 209.) However, "[t]hat's not to say there are no consequences for failing

27

to cooperate in the investigation or participate in services. One consequence is that those failures 'can be used later as evidence in a review hearing or a hearing on a [section 300] petition.' [Citation.]" (*Ibid.*) The juvenile court thus was permitted to consider mother's failure to comply with the safety plan and safety conditions, and her lack of cooperation with DCFS.

Mother emphasizes portions of the record that cut against a jurisdictional finding: DCFS's observations that the children appeared happy and healthy and the home's messy condition posed no immediate safety hazards, father's comment that she "handle[s] kids well," DCFS's acknowledgment that mother was "resilient." We do not reweigh evidence, however, and must uphold the court's orders if any substantial evidence, contradicted or uncontradicted, supports them. (See *In re I.J.*, *supra*, 56 Cal.4th at p. 773.) Although the evidence here may be mixed, sufficient evidence supports the court's jurisdictional findings.

In her reply brief, mother contends the instant case is analogous to *In re Ma.V.* (2021) 64 Cal.App.5th 11, which was published after mother filed her opening brief. We disagree. There, the appellate court expressly found that the mother "resolved the key concerns warranting jurisdiction" prior to the jurisdiction hearing. (*In re Ma. V.*, *supra*, 64 Cal.App.5th at p. 23.) Here, as discussed above, mother took few steps to address the mental health concerns that prompted the petition. The juvenile court did not err in taking jurisdiction over the children.

II.    *The court adequately stated the facts on which it based removal.*

Mother next contends that the juvenile court failed to state the facts supporting its decision to remove the children from her

28

at the disposition hearing.[10] Father joins this argument as to the removal of P. and M. from mother.

A. *Legal Framework*

"At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child (detriment finding)." (*In re D.B.* (2018) 26 Cal.App.5th 320, 328; see also § 361, subd. (c)(1).) This additional inquiry and heightened burden of proof are "'premised on the notion that keeping children with their parents while proceedings are pending, whenever safely possible, serves not only to protect parents' rights but also children's and society's best interests.' [Citation.]" (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1066-1067.) Even under these rigorous standards, however, "[t]he parent need not be dangerous and the minor need not have actually been harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re D.B.*, *supra*, 26 Cal.App.5th at p. 328.)

---

[10] We reject DCFS's contention that mother forfeited this argument by failing to raise it below. Mother's counsel expressly objected "to any removal" at the disposition hearing. Indeed, before making its ruling, the court acknowledged that mother was "not happy. She wants the kids. I get all that." Father did not raise the issue below; his counsel argued for an order placing P. and M. with him. DCFS does not argue forfeiture as to father, however. To the extent his argument may have been preserved, its success is wholly tied to the success of mother's.

Before ordering removal, the juvenile court must determine "'whether reasonable efforts were made to prevent or eliminate the need for removal of the minor from his or her home,' and 'shall state the facts on which the decision to remove the minor is based.'" (§ 361, subd. (e); *In re D.P.*, *supra*, 44 Cal.App.5th at p. 1065.) Such facts may include "the parents' past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.*, *supra*, 26 Cal.App.5th at p. 332, citing *In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

We review disposition orders for substantial evidence. (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.) Because the clear and convincing standard of proof applies at disposition, however, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting [our] review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012; see also *In re V.L.*, *supra*, 54 Cal.App.5th at p. 155 [holding that "*O.B.* is controlling in dependency cases"].)

B.    *Analysis*

Mother contends the trial court's removal order did "not identify any facts supporting removal or make any findings concerning whether there were reasonable means to prevent removal as required by section 361, subdivision (c). Instead, the court simply referenced Dependency Order 415 . . . ."

30

Dependency Court Order 415 consists of boilerplate language stating that the court has read and considered the evidence before it and makes various findings, including those required by section 361, subdivisions (c) and (e).  (See *In re D.P.*, *supra*, 44 Cal.App.5th 1065-1066.)  The language of Dependency Court Order 415 is generic, not case-specific. Reference to Dependency Court Order 415 accordingly "is not a replacement for a statement of the facts supporting the court's decision to remove a child from a parent's custody."  (*Id.* at p. 1067.)  "Contrary to section 361, subdivision (e)'s command to 'state *the facts* on which the decision to remove the minor is based' (italics added), Dependency Court Order 415 merely recites the findings the juvenile court must draw from the supporting facts to order removal under section 361.  Incorporating Dependency Court Order 415 into a removal order without stating the facts that support removal does not comply with the mandate in section 361, subdivision (e)."  (*Ibid.*)

Here, the court incorporated Dependency Court Order 415 into the removal order, stating that it was "attached, but need not be recited."  However, this was not the sole finding the court made.  The court also stated that it found mother's unwillingness to abide by the safety plan and other programs "troubling" and "removal is appropriate on that ground."  It continued, "especially when, as set forth in the jurisdictional findings, which I now adopt, the mother was exhibiting behavior which is . . . detrimental and inconsistent to the safety and welfare of her children.  I believe that removal at this juncture is appropriate."  The court is permitted to state the facts on which removal is based orally (see *In re Heather A.* (1996) 52 Cal.App.4th 183, 196), and here it not only stated that removal was based on

31

mother's noncompliance with the safety plan and other programs, but also incorporated the findings it made at the jurisdiction hearing.

Even if these statements are insufficient, any error is harmless. The failure to make required findings under section 361, subdivision (c) "will be deemed harmless where 'it is not reasonably probable such finding, if made, would have been in favor continued parental custody.'" (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218.) As explained in *In re D.P.*, *supra*, 44 Cal.App.5th at p. 1068, this is because removal orders are "subject to the constitutional mandate that no judgment shall be set aside 'unless, after an examination of the entire cause, including the evidence, the [appellate] court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'" "Under this mandate, a 'miscarriage of justice' will be declared only when the appellate court, after examining the entire case, is of the opinion that "'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'"" (*Ibid.*)

It is not reasonably probable that a result more favorable to mother would have been reached. Over the objection of DCFS, the court initially released the children to mother on the condition that she comply with several safety conditions. Mother failed to do so. Subsequently, mother failed to remain in contact with DCFS, failed to drug test, and took only minimal steps toward addressing her ongoing mental health issues. Any error accordingly was harmless.

32

III.   *The court did not abuse its discretion by ordering monitored visitation.*

Mother's final argument, which father does not join, is that the juvenile court abused its discretion by ordering monitored visitation for her.  She contends monitoring "was not necessary to protect the children," because "[a]s of July 21, 2020 [the date of the detention hearing] the court found the children could remain in Mother's care with certain safety conditions."

A.   *Legal Framework*

In ordering visitation, the juvenile court must balance the "interests of the parent in visitation with the best interests of the child" and "impose any other conditions or requirements to further define the right to visitation in light of the particular circumstances of the case before it."  (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.)  We review orders prescribing visitation terms for abuse of discretion.  (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.)  "We will not disturb the order unless the trial court made an arbitrary, capricious, or patently absurd determination."  (*Ibid.*)

B.   *Analysis*

The court ordered monitored in-person visitation for all four children, and unmonitored phone visits with D. and T.  This was not an abuse of discretion.  Though the children were initially placed with mother in July 2020, they were detained from her in August 2020 due to her failure to adhere to the safety conditions imposed by the court.  Even after the children were detained, there was no indication that mother's compliance or her underlying mental health issues improved.  The court reasonably could conclude that mother might experience mood swings, aggression, or even an "explosion" with the children during visits,

33

and that a monitor accordingly would be in the children's best interests.  Mother also told DCFS she "did not want in-person visits" with P. and M. because she believed such visits would "be too difficult for her."  Mother's recognition that she would find the visits "difficult" suggests that the risk to the children could be heightened if mother was unable to control her emotions or actions.  Indeed, responders to the first 911 call found mother unable to carry on a conversation or answer questions even when she was trying to "pull herself together."

## DISPOSITION

The jurisdiction and disposition orders of the juvenile court are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


MANELLA, P. J.


CURREY, J

34